Henry T. Talmadge and Jacob H. Van Deventer, trading as Henry Talmadge & Company, Appellees, v. Clewiston Iron Company, Communipaw Company and Clewiston Company, Inc., Defendants. Clewiston Company, Inc., Appellant.

Gen. No. 33,137.

Opinion filed April 30, 1929.

ALDEN, LATHAM. & YOUNG, for appellant; CHARLES MARTIN, of counsel.

CHAPMAN & CUTLER, for appellees; JOHN E. TRACY and CHARLES M. THOMSON, of counsel.

MR. JUSTICE BARNES delivered the opinion of the court.

This is an appeal from a judgment for $25,218.50 against the Clewiston Company, Incorporated, the only defendant served with process or appearing in the case.

The suit is based on four promissory notes executed by the Clewiston Iron Company, three for $5,000 each,

and one for $7,500, dated October 17, 1925, payable January 15, 1926, to the order of Communipaw Company, and indorsed by the maker, by "Clewiston, Limited" (the then name of appellant) and by the payee in the order mentioned.

Plaintiffs allege in their pleading that they were purchasers of the notes before maturity for a valuable consideration and that the notes were duly protested for nonpayment. Appellant's pleading denies these averments of consideration and protest and alleges that it was an accommodation indorser, of which plaintiffs had notice, without consideration, and that its indorsements are *ultra vires* and void. The cause was heard without a jury.

The material facts are not controverted. Their construction, however, is.

Appellant is a Florida corporation. At the time of the transaction in question its name was "Clewiston, Limited." Its name had been changed to Clewiston Company, Incorporated, at the time of this action. Its charter powers are numerous and comprehensive. They will be referred to more specifically later. Its primary object, however, was to establish and develop a town site and certain means and enterprises calculated to promote its development and the sale of appellant's lots therein. Under its powers it had founded a town site called "Clewiston" in the interior of southern Florida which embraced nearly 3,000 acres divided into about 10,000 lots having a sale price of over $14,000,000. At the time of the transaction in question (October, 1925) the work at the town site had developed to the point where permanent buildings could be constructed.

One Russell B. Smith was its general manager. His plan of development contemplated installing certain key industries and granting subsidies for that purpose, including means of transportation, an electric light and power plant, a steel fabricating plant and other lines

of industry possessing features deemed necessary for the development of the town site. With this scheme in mind Smith met in New York one Lusk, who was the president and principal stockholder of the Communipaw Company which owned a structural steel plant in New Jersey. After certain conferences they came to an understanding and agreement—as evidenced by three letters dated October 15, 1925, from appellant by Smith, its manager, to Lusk—by which Lusk was to form a new corporation named the Clewiston Iron Works under Florida law, acquire said plant and machinery, assign the same and his interests to said new company in consideration of all its stock (which he subsequently obtained), remove and set up the equipment in Clewiston not later than November 1, 1925, and provide a working and executive personnel for its operation, Lusk to manage its affairs as its president, and the new company to purchase a specific block reserved for it in Clewiston by appellant. Smith was to submit notes of the new company of the amount and form of those in question to appellant for indorsement "in consideration of prompt establishment of equipment at Clewiston," and to effect the movement and installation appellant's check for $1,250 was issued, and its additional checks were to be issued to cover the expenses of moving and installing the machinery at Clewiston, and for a working and executive personnel of the plant, for which the new company was to give notes to appellant, such expenses not to exceed $25,000. All these notes were to be held by the payee or nominee until purchased by the organization "now forming for the purpose of assisting the establishment of industries at Clewiston." If there was any such organization it does not appear in the evidence. We think, however, that proof on that subject was not essential to the cause of action. The third letter said certain delays in acquiring a Florida charter might occur and that in the meantime a Delaware corporation named Clewiston Iron Works

would be substituted. Just what was done about substitution does not appear and is seemingly immaterial. Pursuant to such understanding, the notes in question dated October 17, 1925, were executed in the name of "Clewiston Iron Company" by its president and by its treasurer, and were also indorsed in the same manner. When and how the new company was chartered and organized was not shown, but it appears to have functioned as a regular corporation and to have purchased from the Communipaw Company, pursuant to the arrangement outlined in said letters, its machinery and plant, paying therefor by executing the notes in question and other notes payable to Lusk personally. The notes in question were delivered to Smith who forwarded the same to appellant's principal office in Chicago for indorsement, where they were indorsed as aforesaid by its vice president and its treasurer. After indorsement appellant's vice president on October 23, 1925, sent the notes directly to Lusk with an accompanying letter saying that they were sent at the request of Smith in connection with the deal as outlined in Smith's three letters to Lusk under date of October 15, 1925. Their purpose seems to have been well understood by the company.

The notes in question were given by Lusk October 27, 1925, to plaintiffs, a banking firm which had business dealings with and had advanced money to the Communipaw Company on its accounts receivable, and which credited on its books the amount of the notes against the indebtedness of that company to plaintiffs for about $100,000. Plaintiffs were informed that they were given for the purchase price of the machinery of said company. They had not, however, seen the contract therefor and first knew only from the notes to whom the sale was made. At that time the Communipaw Company practically ceased doing business. Plaintiffs were its principal creditors and evidently expected and understood that said company was to

dispose of its assets and apply the proceeds on such indebtedness.

After transfer of the machinery to the Clewiston Iron Company, of which Lusk became president, the machinery was dismantled and boxed for transportation. A shipment of three cars was made October 20, and others followed December 14, 1925. The cost of removing the machinery, including boxing, moving and freight, and the contemplated organization of the working personnel of the new company, amounted to $14,500. The site for the plant had been selected, the foundation and frame of the building set, and said shipments had arrived in Clewiston. The last advance for such expenses from appellant was through its manager Smith, December 6. He resigned about December 17. The $14,500 having been expended and accounted for to Smith, Lusk came to Chicago and applied to Dahlberg, appellant's president, for additional funds for expenses. He refused any further advances saying he was not going into the iron business. Not having the necessary funds to go on with the work, the installation of the plant in Clewiston was not completed.

Appellant offered no evidence. The cause was submitted to the court on plaintiffs' evidence in substance as aforesaid, together with propositions of law by each party.

It appearing that appellant's indorsement of the notes in question was made prior to their delivery to the payee and the latter's indorsement—and it would so appear on the notes themselves—plaintiffs rely upon the foregoing facts to show that appellant was not a mere accommodation indorser but that its indorsement was for a valuable consideration. We think the enumerated facts were sufficient to establish that contention, and the real question presented upon the record is whether such indorsement or guaranty was *ultra vires*.

Upon the above state of facts it is apparent that appellant's indorsement was in the nature of a guaranty. As indorser, however, it was entitled to due notice of protest, and we think the evidence sufficiently shows that due service of notice thereof was made. The alleged insufficiency of the proof because it merely shows that the notice was dropped in a chute in a building which contained a United States mail box without proving direct connection of the chute with such box, we deem too trivial for discussion. Mail chutes are so generally installed in modern office buildings that one may presumptively use them with assurance of having thereby mailed his correspondence without first making a physical inspection to test their efficiency. We think there was prima facie proof of mailing the notice. (*Tobin v. Taintor*, 229 Mass. 174.)

As to the contention that plaintiffs did not prove that the officers executing the indorsement had authority to sign it, it is sufficient to say that the pleadings expressly admit the indorsement of the notes by "defendant," and as defendant's affidavit of merits did not expressly deny authority to make the indorsement, an issue on that question is not raised. (*Richelieu Hotel Co. v. International Military Encampment Co.*, 140 Ill. 248, 266.)

We ascribe no special force to the power given in appellant's charter to indorse negotiable notes. We take it that such power is intended to be exercised mainly if not altogether where such notes are given or taken in the course of the corporation's legitimate business, and, therefore, affords little assistance in determining the point in question.

The general principle that a corporation has no implied power to indorse notes for the mere accommodation of another even though it may be incidentally benefited thereby is so well settled as not to need citation of authorities. And it is a recognized principle that "it is no part of the ordinary business of commer-

cial corporations, and, *a fortiori*, still less so of non-commercial corporations, to become surety for others.'' (*Best Brewing Co. v. Klassen*, 185 Ill. 37.) In the decision just referred to the court went on to say: ''Under ordinary circumstances, without positive authority in this behalf in the grant of corporate power, all engagements of this description are *ultra vires*, whether in the indirect form of going on accommodation bills or otherwise becoming liable for the debts of others.'' And it was said in *Calumet & Chicago Canal & Dock Co. v. Conkling*, 273 Ill. 318: ''An implied or incidental power must be directly or immediately appropriate to the execution of the powers expressly granted and not one that has a slight or remote relation to it.'' These general principles are set forth in Fletcher's Ency. of Corporations, vol. 2, secs. 924–926. In the latter section it is stated:

''The general rule that a corporation has no implied power to become guarantor or surety is based upon the ground that such a transaction is foreign to the objects of its creation, and not upon the ground that there is an absolute want of power on the part of a corporation to bind itself by such a contract. The power to act as surety or guarantor exists in the case of corporations, though not expressly conferred, whenever it is necessary to enable them to accomplish the objects for which they are created, or whenever the particular transaction is reasonably necessary or proper in the conduct of their business.''

In Morawetz Priv. Corp. No. 362, it is said: '' . . . it is impossible to decide abstractly that acts of a particular description are within or without the chartered powers of a corporation. The right of a corporation to perform an act depends in every case upon all the surrounding circumstances.''

It will be noted that in nearly every case arising for the determination of implied corporate powers the language used in defining them is more or less qualified.

In the *Best Brewing* case, *supra,* the court said: "If the act had been *reasonably necessary to accomplish the end* for which the corporation was formed,—it would have been within the scope of the corporate power." In the *Richelieu Hotel* case, *supra,* where the hotel had subscribed with others to procure the location of a military encampment in Chicago, it was held to be within the corporate powers of the hotel as "an expedient *directly calculated* to increase the number of patrons of the hotel." But as said in the *Brewing Co.* case, *supra:*

"It cannot be held that every act in furtherance of the interests of a corporation is *inter vires.* Many acts can be suggested which, though beneficial to the business of a corporation, are too remote from its general purposes to be deemed reasonably within its implied powers. What is and what is not too remote must be determined *according to the facts of each case.*"

Discussing the question in *Northside Ry. Co. v. Worthington,* 88 Tex. 562, 30 S. W. 1055, 1058, the court said:

"In every express grant there is implied a power to do whatever is necessary or *reasonably appropriate* to the exercise of the authority expressly conferred. The difficulty arises in any particular case whenever we attempt to determine whether the power of a corporation to do an act can be implied or not. The question has given rise to much litigious controversy and to much conflict of decision. It is not easy to lay down a rule by which the question may be determined."

The court then refers to the rule laid down in Green's Brice, Ultra Vires, 88:

"Whatever be a company's legitimate business, the company may foster it by all the usual means. . . . the courts have, however, determined that such means shall be direct, not indirect, i. e., that a company shall

not enter into engagements, as the rendering of assistance to other undertakings, from which it anticipates a benefit to itself, not immediately, but mediately by reaction, as it were, from the success of the operations thus encouraged; all such proceedings inevitably tending to breaches of duty on the part of the directors, to abandonment of its peculiar objects on part of the corporation.''

But as indicated in most of the authorities any attempt to lay down a proper line of demarcation between powers reasonably necessary to a business, or usually incident to its transaction, and those which are not, or to determine what is reasonably appropriate to its conduct, depends upon the particular facts of the case.

It would be impracticable to attempt to distinguish the facts in the various cases cited wherein this question has been considered and with reference to which the courts have drawn a line betwen direct and remote benefits. It is recognized that the authorities are not always harmonious or consistent in their application of the law to the facts. The principles of law are not questioned. The difficulty is in their application to a particular state of facts—or, as said in the *Texas* case, *supra,* in determining whether the power of a corporation can be implied or not. As there said: ''If they be unusual, and tend in an indirect manner only to promote its interests, they are held to be *ultra vires.*'' On the other hand, as a general rule, if they be immediately appropriate to the primary object of the corporation they will be implied. ''Generally the charter powers of land and investment companies are very broad'' and liberally construed as to their implied and incidental powers. (Fletcher's Cyc. Corp., vol. 2, sec. 873.) In the *Texas* case, *supra,* a land company having a suburban subdivision near the City of Fort Worth executed bonds jointly with a railway line con-

necting it with Fort Worth, each company deeming the enterprises mutually beneficial and calculated to increase the value of the lots on one hand, and to make the street railway a paying investment on the other. The issuance of the bonds under such circumstances was held to be *ultra vires.* On the other hand, another phase of the litigation was considered in *Fort Worth City Co. v. Smith Bridge Co.,* 151 U. S. 294. There the land company entered into an agreement to pay a part of the cost of constructing a bridge that would make its subdivision more accessible, and it was held that the object of the land company would be directly promoted thereby and was fairly incidental to its powers. In *Sherman Center Town Co. v. Russell,* 46 Kan. 382, 26 Pac. 715, a town-site company donated land and paid a sum of money for the transfer of a business from another town to its town site. It was held to be within the implied powers of the company. In *Arkansas Valley Town & Land Co. v. Lincoln,* 56 Kan. 145, 42 Pac. 706, a town site company was held liable on its guaranty that a railroad would be constructed and in operation to the town site within a given time. The guaranty was to induce a merchant to remove his store building and merchandise to the town site from a village a short distance away. *Irwin v. Colburn,* 56 Cal. App. 41, 204 Pac. 551, is a case where a canning corporation in consideration of the lessee of a farm, agreeing to raise tomatoes thereon and sell them to the corporation, indorsed the notes of said lessee given in payment of rent for the farm. It was held the indorsement was for a good consideration and within the company's implied powers. A somewhat similar case is *Farmers' State Bank of Riverton v. Haun,* 30 Wyo. 322, 222 Pac. 45. Other pertinent cases in our own courts upholding implied powers are *Green Co. v. Blodgett,* 159 Ill. 169; *Central Lumber Co. v. Kelter,* 201 Ill. 503; *Midland Tel. Co. v. National Tel. News Co.,* 236 Ill. 476; *Standard Brewery v. Creedon,* 283 Ill. 474; *Kraft v. West*

*Side Brewery Co.*, 219 Ill. 205. In the *Midland Tel.* case, *supra,* the court said:

"If, however, the debt which it guarantees is a debt the payment of which will redound to the financial benefit of the corporation signing the guaranty, it may be valid and enforcible. . . . And in exercising powers conferred by its charter a corporation may adopt any proper and convenient means tending directly to their accomplishment and not amounting to the transaction of a separate, unauthorized business."

On the other hand, appellant cites many cases where under different states of facts the powers exercised by the particular corporation were held not to be implied. It would subserve no good purpose to discuss the distinctions the different states of facts present in the various cases.

Looking to the particular facts of the case at bar we should first inquire, what are the objects and express charter powers of appellant corporation?

Included among its specific enumerated powers are acquiring and dealing in realty and personalty in the State of Florida and elsewhere of every nature and description for cash or on credit; to make contracts looking to the development thereof; to engage in works of internal improvements; to construct canals, drains and ditches; to acquire, develop, sell and exchange property of every character; "to construct, maintain, lease and operate buildings and structures of any and all kinds"; to manufacture various timber products and by-products, phosphate and fertilizers, and products and by-products of other enumerated articles; to construct, etc., various transportation facilities or conveniences and to operate the same; to own, operate, lease, hire, use and maintain docks, wharfs, storage facilities, etc.; to indorse negotiable or transferable notes, etc.; to trade in any and all goods, wares, merchandise and property of every class and description. After enumerating these and various other objects and

powers of the corporation the charter provides that it may do any and all other acts and things and exercise any and all other powers "which may be deemed necessary, expedient or convenient in connection with or in addition to the business and businesses hereinbefore specified, which a natural person or corporation of this character may lawfully do and exercise," stating that it is the intention that all the objects and powers so specified shall, except where otherwise expressed in said paragraph, be in nowise limited or restricted by reference to or inference from the terms of any other clause of the charter, but that "the objects and powers specified in each of the clauses of this paragraph shall be regarded as independent objects and powers."

The comprehensive language employed in the charter might seem almost to include as an express power of the corporation the right to own, operate and build a fabricating steel plant, and if it could do so directly the power to accomplish the same result indirectly would, we think, be implied. If appellant's charter restricted its object and powers to those of merely acquiring and selling real estate and such powers as are usual or ordinarily incidental to such a business we might hesitate to say that the establishment of a steel plant or extending credit therefor would be within its implied powers because the benefits to be derived therefrom would seem to be too remote and not essential or immediately appropriate to its primary object. But the charter powers of appellant are so broad and comprehensive as to include within their scope not only its right to establish various enumerated industries and facilities but other "business" that would reasonably and directly tend to promote the development of its town site and its power to resort to any convenient and appropriate means for such purpose. If appellant could under such powers construct and operate a steel plant for promoting the development of its town

site we think it could hire another to do so or extend credit directly for the accomplishment of that purpose whether it be by a loan or the indorsement of notes given directly for that purpose.

It seems to have been within the scheme for the development of the town site to establish such a plant and various other key industries, especially those which would enable purchasers and contractors to acquire building materials on the ground, thus saving delays and the cost of transportation. We think we may safely assume from the record that the location of the town site in the interior of Florida at that time presented difficulties of this character that had to be met in order to attract purchasers and induce immigration to the town site. Considering, therefore, all the powers given by appellant's charter and its various objects it would seem that most of the powers so granted were subsidiary to the general plan of developing a town site in a locality where a fabricating steel plant and other contemplated industries were, if not necessary, reasonably appropriate to the promotion of such plan. That appellant would be directly benefited thereby is entitled to much consideration. (*Richelieu Hotel* case, *supra.*) In view of the entire enterprise we would, therefore, hardly deem the establishment of a fabricating plant or the extension of credit therefor in the manner done in this case as too remote from the express objects for which appellant was organized.

We do not think any alleged breach of trust by Lusk with appellant is available as a defense to this suit by plaintiff. But were we to hold otherwise we think the record discloses that appellant was guilty of the first serious breach by its refusal to advance the expenses it had agreed to pay for transporting and setting up the plant and organizing the personnel for its operation.

The burden of proof was on defendant to establish the defense of *ultra vires*. (Fletcher's Cyc. Corp., vol.

2, sec. 811; *Mayer v. Illinois Life Ins. Co.*, 211 Ill. App. 285.) We do not think it met that burden. It has been said that the application of the doctrine of *ultra vires* to the acts of a corporation in suits by individuals yields not only to necessity, "but to transactions incidental to broad powers" (*Ellerman v. Chicago Junct. Rys. & Union Stockyards Co.*, 49 N. J. Eq. 217, 23 Atl. 287), and as before stated generally the charter powers of land and investment companies are very broad, and liberally construed as to their implied or incidental powers. (Fletcher's Cyc. Corp., vol. 2, sec. 873.)

We think, therefore, the judgment should be affirmed.

*Affirmed.*

GRIDLEY, P. J., and SCANLAN, J., concur.